**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| IN RE:<br><br>Guglielmo D'Urso a/k/a William Durso,<br><br>Debtor. | CHAPTER 13<br><br>CASE NO.: 05-22274 |
| Rosario Parisi and Maria Parisi,<br><br>Plaintiff,<br><br>v.<br><br>Guglielmo D'Urso a/k/a William Durso d/b/a SAJ Associates, LLC,<br><br>Defendant. | ADV. NO.: 12-1685<br><br>OPINION |

**FILED**
JAMES J. WALDRON, CLERK
June 27, 2013
U.S. BANKRUPTCY COURT
NEWARK, N.J.
BY: /s/ Nelson Dos Santos,
Deputy

**Before:** **HON. NOVALYN L. WINFIELD**

**A P P E A R A N C E S :**

Peter J. Broege, Esq.
Broege, Neumann, Fischer & Shaver, LLC
25 Abe Voorhees Drive
Manasquan, NJ 08736
Attorney for Debtor/Defendant

Joel H. Freschl, Esq.
Law Offices of Antonietta L. Milelli, LLC
176 Morris Street
Morristown, NJ 07960
Attorney for Plaintiffs

This matter is before the court on the Debtor's Motion for Summary Judgment seeking dismissal of the complaint and the Plaintiffs' Motion for Summary Judgment seeking a determination that a debt in the form of an unreturned security deposit is nondischargeable pursuant to § 523(a)(4) of the United States Bankruptcy Code. For the reasons set forth below, the Debtor's Motion for Summary Judgment is denied and the Plaintiffs' Motion for Summary Judgment is granted.

## JURISDICTION

This court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and the Standing Order of Reference issued by the United States District Court for the District of New Jersey on September 18, 2012. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

## BACKGROUND

Guglielmo D'Urso ("Debtor") filed a Chapter 7 petition on February 29, 2012 (the "Petition Date"). The Debtor is a 50% owner of SAJ Associates, LLC ("SAJ"). (Compl. ¶ 21) The remaining 50% ownership interest in SAJ is held in trust for the children of former partner, Harry Olstein. (*Id.*)

In March of 2009, Rosario and Maria Parisi (the "Plaintiffs") entered into a residential lease agreement (the "Lease") with SAJ for property located at 8 Tanager Lane, Mendham Township, Morris County, New Jersey (the "Property"). (Parisi Cert. ¶ 2) The Debtor was present at the Lease signing and, notably, was the only representative of SAJ present. (*Id.* at ¶ 3) The Plaintiffs assert that the Debtor represented himself to the Plaintiffs as an owner of the Property. (*Id.* at ¶ 4) The Debtor does not dispute this representation.

2

At the time the Lease was signed, the Plaintiffs tendered a check for the first month's rent in the amount of $12,000, and a second check to SAJ in the amount of $18,000 as a security deposit pursuant to the terms of the Lease. (*Id.* at ¶ 3)  The Debtor endorsed both checks and deposited them into the SAJ checking account at Wachovia Bank on April 2, 2009 and April 3, 2009, respectively. (Compl. Ex. D)

Paragraph 6 of the Lease includes the following language:

> **SECURITY DEPOSIT**: Landlord shall comply with the Rent Security Deposit Act (N.J.S.A. 46:8-19 et. seq.; the "Act"). This includes depositing the Security Deposit into a banking institution or investment company in New Jersey and notifying the Tenant in writing within 30 days of the Landlord's receipt of the Security Deposit of (i) the name and address of the banking institution or investment company; (ii) the type of account in which the Security Deposit is deposited or invested (for example interest bearing or money market); (iii) the amount of the Security Deposit and (iv) the current rate of interest for the account. . .
>
> Within 30 days of the termination of the Lease, the Landlord shall return the Security Deposit plus the undistributed interest to the Tenant, less any charges expended by the Landlord for damages to the Property resulting from the Tenant's occupancy. The interest and deductions shall be itemized in a statement by the Landlord, and shall be forwarded to the Tenant with the balance of the Security Deposit by personal delivery, registered or certified mail.

(Compl. Ex. A)

The Lease expired on July 31, 2010. (*Id.*)  In accordance with the terms of the Lease, on June 1, 2010, the Plaintiffs notified the Debtor in writing that they would be vacating the Property on July 31, 2010. (Compl. Ex. C; Parisi Cert. ¶ 6)  The Plaintiffs did vacate the Property by same date. (*Id.*)  On or around July 31, 2010, Mike Krause and Al Ptalis performed a walk through inspection on behalf of SAJ, who requested that the Plaintiffs clean the carpet, paint the basement, and provide mulch for the landscaping. (*Id.* at ¶ 6)  The Plaintiffs complied with these requests. (*Id.*)  The Debtor does not contest that Plaintiffs performed the requested clean-up.  Instead, in the brief in support of his motion for summary judgment, the Debtor

3

merely suggests that there is a factual issue as to damage done to the Property by the Plaintiffs. (Def.'s Mem. Supp. Summ. J. 2, Answer ¶ 14)  The Debtor does not provide any affidavit or certification as to the nature of the alleged damages.

The Plaintiffs state that during August 2010 they made repeated requests to the Debtor for return of the $18,000 security deposit, but that the Debtor ignored their requests.  (Parisi Cert. ¶ 8)  The Debtor acknowledges that he did not return the security deposit to the Plaintiffs, nor did he provide the Plaintiffs with an accounting for the $18,000 security deposit.  (Def.'s Mem. Supp. Summ. J. 2; Parisi Cert. ¶¶ 8, 9, 10)  The Debtor's brief simply states that SAJ used the Plaintiffs' security deposit of $18,000 in the ordinary course of its business.  (Def.'s Mem. Supp. Summ. J. 18)

On September 20, 2010, the Plaintiffs commenced a lawsuit in the Superior Court of New Jersey, Law Division, Morris County, naming SAJ and the Debtor individually for multiple violations of the New Jersey Rent Security Deposit Act (the "State Court Action"). (Parisi Cert. ¶ 10)  Default judgment was entered against SAJ in the State Court Action.  (Parisi Cert. ¶ 11)

While the State Court Action was pending, and pursuant to the Plaintiffs' subpoena, SAJ's checking account statements (the "Bank Records") were obtained from Wachovia Bank, now Wells Fargo Bank.  (*Id.* at ¶12–13)  On the account statements, the account owner is listed as SAJ Associates, LLC c/o D'Urso Group, 36 Chatham Road, Short Hills, New Jersey. (Compl. Ex. D)  The Plaintiffs assert that SAJ maintains its principal office at that address. (Compl. ¶ 9)

The Bank Records demonstrate the following:

4

(1) On April 2, 2009 and April 3, 2009, the Debtor deposited the first month's rent in the amount of $12,000 and the security deposit in the amount of $18,000 into the SAJ checking account;

(2) Later that same month, two checks, in the amounts of $5,000 and $13,000 were issued from SAJ's checking account to D'Urso Holdings, LLC[1] on April 15, 2009 and April 21, 2009, respectively;

(3) The Debtor was the signatory on both the checks issued to D'Urso Holdings, LLC;

(4) At the close of April 2009, the same month that the Plaintiffs' rent and security deposit totaling $30,000 were deposited into the SAJ checking account, the account had a closing balance of $424.81;

(5) The Debtor signed each check written from the SAJ checking account from the period of March 2009 until the account was closed in early 2011 as reflected in Exhibit D to the Complaint.

(Compl. Ex. D)

The Plaintiffs timely commenced the within adversary proceeding, seeking relief under § 523(a)(4) of the Code, and the Debtor filed an answer that is essentially a general denial. The Debtor also asserted seven affirmative defenses. These affirmative defenses are somewhat repetitive and can be grouped as follows: SAJ, not the Debtor, is the proper defendant; the Plaintiffs' damages to the Property exceed the amount of the security deposit; the Debtor was not a fiduciary; and disbursements from the SAJ checking account were made in the ordinary

---

[1] Schedule B to the Debtor's Chapter 7 petition states that the Debtor owns 100% of D'Urso Holdings, LLC. The schedule also reflects 100% ownership interest in three other limited liability companies, as well as the Debtor's 50% interest in SAJ. The court takes judicial notice of the information on the Debtor's schedules. *See In re Kesler*, No. 12-12716, 2013 WL 653089 at *6 (Bankr. D.N.J. Feb. 21. 2013)(the Bankruptcy Court took judicial notice that the debtor's schedules did not disclose claims against certain parties); *In re Indian Palms Assocs., Ltd.*, 61 F.3d 197, 205 (3d Cir.1995)(concluding that judicial notice can be taken of certain facts such as that a document was filed, a position taken, an admission or allegation made "as long as it is not unfair to a party to do so and does not undermine the trial court's fact-finding authority").

course of business. The Debtor now moves for summary judgment solely on the basis that the Plaintiffs' cause of action lies against SAJ, and that Plaintiff caused damage to the Property. The Plaintiffs cross-move for summary judgment seeking a determination that the debt at issue is nondischargeable pursuant to § 523(a)(4) of the Bankruptcy Code. The Plaintiffs contend that the court should disregard SAJ's corporate structure to hold the Debtor personally liable for failing to hold their $18,000 security deposit in the manner required by the New Jersey Rent Security Deposit Act, and failing to return the security deposit to the Plaintiffs.

## DISCUSSION

### A. *Summary Judgment Standard*

Federal Rule of Civil Procedure 56 ("Rule"), made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7056, provides for entry of summary judgment where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Fed. R. Bankr. P. 7056. The moving party must demonstrate that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). An issue of material fact is considered genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A properly supported motion for summary judgment "will not be defeated by the mere existence of some factual dispute between the parties," unless the dispute over those facts has the potential to affect the lawsuit's outcome. *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995).

Once the moving party satisfies its burden, "the burden shifts to the non-moving party to 'do more than simply show that there is some metaphysical doubt as to the material facts.'" *DeAngelis v. Young (In re Young)*, No. 09-1774, 2010 WL 4777626, *5 (Bankr. D.N.J. Nov. 15,

6

2010) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). A party may not defeat a motion for summary judgment unless the party sets forth specific facts in a form that "would be admissible in evidence." *Id.* "The party opposing summary judgment 'may not rest upon the mere allegations or denials of the ... pleading,' its response, 'by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.'" *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)); Fed. R. Civ. P. 56(e). If the non-moving party's evidence is a mere scintilla or is not "significantly probative," the court may grant summary judgment for the movant. *Id.* (citing *Anderson*, 477 U.S. at 249–50).

The Debtor's summary judgment motion is wholly unsupported by exhibits or sworn statements of any kind, and therefore fails to comply with Federal Rule of Civil Procedure 56(c)[2]. The Debtor merely provides the court with an extremely brief factual background as part of his brief, but fails to attach <u>any</u> certifications or exhibits to his Motion. (*See* Def.'s

---

[2] **(c) Procedures:**

  **(1)** *Supporting Factual Positions*. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
  
  **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
  **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
  
  **(2)** *Objection That a Fact Is Not Supported by Admissible Evidence*. A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
  
  **(3)** *Materials Not Cited*. The court need consider only the cited materials, but it may consider other materials in the record.
  
  **(4)** *Affidavits or Declarations*. An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

7

Mem. Supp. Summ. J.)  The Debtor's brief attempts to create a factual issue by stating ". . . there appears to be a factual issue as to damage done to the property by the Plaintiffs." (*See* Def.'s Mem. Supp. Summ. J. 2)  Particularly in the face of the Plaintiffs' competing motion for summary judgment, this statement by the Debtor cannot support a motion for summary judgment.

To the extent the Debtor's motion can be construed as a motion to dismiss pursuant to Rule 12(b)(6), it also fails.  Rule 12(b)(6) allows a court to dismiss a complaint if the defendant shows that the plaintiff fails to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6); *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  Under Rule 8(a)(2), made applicable by the Federal Rules of Bankruptcy Procedure Rule 7008, a pleading must provide a "short and plaint statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8.  There must be enough facts pleaded to raise the reasonable expectation that discovery will reveal evidence of the elements of the alleged claims.  *Bell Atl. Corp. v. Twombly*, 550 U.S. at 556.  In other words, the plaintiff must provide "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.  Determination of the plausibility of a claim for relief is a context-specific task "that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009).

As will be discussed *infra*, the Plaintiffs have pleaded and established sufficient, unrefuted facts demonstrating that the Debtor was subject to fiduciary obligations and knowingly breached those obligations by failing to place the security deposit in an interest bearing account, by depositing the security deposit into the D'Urso Holdings, LLC account, and failing to return the security deposit to the Plaintiffs.  As such, the Debtor's motion fails to satisfy the standard for a motion to dismiss.

8

### B. *Piercing the Corporate Veil*

The Plaintiffs acknowledge that they engaged in a transaction for the lease of property with SAJ, and not the Debtor individually. However, the Plaintiffs argue that because the Debtor had complete control over SAJ, there is a basis for the court to pierce the corporate veil. Veil piercing is an equitable remedy whereby the court disregards the corporate existence and holds the individual principal(s) liable for the corporation's debts. *In re Blastein*, 192 F.3d 88, 100 (3d Cir. 1999). "[T]he party seeking an exception to the fundamental principle that a corporation is a separate entity from its principal bears the burden of proving that the court should disregard the corporate entity." *Tung v. Briant Park Homes, Inc.*, 287 N.J. Super 232, 240, 670 A.2d 1092 (App. Div. 1996).

To pierce the corporate veil, a party must establish (1) that a corporation was dominated by the principal or parent corporation, and (2) that adherence to the fiction of separate corporate existence would perpetrate a fraud or injustice, or otherwise circumvent the law. *Bursetin v. Harry M. Stevens, Inc.*, 387 N.J. Super. 160, 199–200, 903 A.2d 475, 475 (App. Div. 2006). The usual veil-piercing case requires a fact-sensitive analysis focusing on the extent to which a corporation was dominated by its parent or principal. *In re Monroe Ctr. II Urban Renewal Co., LLC*, No. 08–32556, 2012 WL 3638602 (Bankr. D.N.J. Aug. 22, 2012). When conducting a veil-piercing analysis, courts typically consider facts such as whether a corporation was undercapitalized, failed to observe corporate formalities, failed to keep adequate records, siphoning of funds from the debtor corporation by the dominant stockholder, and insolvency of the debtor corporation. *Id.* at *2; *see also Trustee of Nat. Elevator Industry Pension v. Lutyk*, 332 F.3d 188, 194 (3d Cir. 2003). However, these factors are not a rigid test, nor an exhaustive

9

list of veil-piercing elements. *Trustee of Nat. Elevator Industry Pension v. Lutyk*, 332 F.3d at 194.

The Plaintiffs argue that the Debtor had complete dominion and control over SAJ because the Debtor was the only active officer and was the manager of SAJ's day-to-day affairs. Given the unrebutted facts before the court, it finds the Plaintiffs' position persuasive.

The Debtor is a 50% owner of SAJ. The other 50% ownership interest is held in trust for the children of former partner Harry Olstein. (Compl. ¶ 21) There is no indication that during the time period in which the Lease was negotiated and the Property was occupied by the Plaintiffs, that anyone, on behalf of the trust, actively participated in the management of SAJ. To the contrary, the available facts evidence the Debtor's sole involvement.

At the Lease signing, the Debtor acted for SAJ and represented himself as the owner of the Property. Additionally, the Bank Records demonstrate that the Debtor financially controlled SAJ, in that he was the only person issuing checks from the SAJ checking account from March 2009 until the account was closed. The Bank Records also show that the Debtor used SAJ for his personal benefit. Shortly after the Debtor deposited the $18,000 security deposit in the SAJ account, he withdrew $18,000 from that checking account and deposited the funds into the D'Urso Holdings, LLC checking account. All of this evidences the Debtor's domination over SAJ as a corporate entity. Given the Debtor's dominion over SAJ and his transfer of the Plaintiffs' security deposit from the SAJ account to the D'Urso Holdings account, an entity wholly owned by him, it is appropriate to pierce the corporate veil to find that the Debtor is personally responsible for turnover of the Plaintiffs' $18,000 security deposit.

C. *Dischargeability of the Debt*

The Plaintiffs further submit that the court should grant summary judgment in their favor because the Debtor committed defalcation while acting in a fiduciary capacity within the meaning of § 523(a)(4) of the United States Bankruptcy Code (the "Code"). Having determined that the corporate veil should be pierced, it is necessary to consider whether the debt is nondischargeable.

Section 523 of the Code, which codifies exceptions to discharge, states in pertinent part:

> **(a)** A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--
>> **(4)** for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

11 U.S.C. § 523(a)(4).

To prevail on a complaint seeking to except a debt from discharge based on a defalcation while acting as a fiduciary, a complainant must prove by a preponderance of the evidence (1) that the debtor was acting in a fiduciary capacity and (2) that while acting in this capacity, the debtor engaged in fraud or defalcation. *In re Tyson*, 450 B.R. 514, 522–523 (Bankr. E.D. Pa. 2011). The court will discuss each element in turn.

1. *Fiduciary Capacity*

The definition of the term "fiduciary" as it is used in § 524 is a question of federal law. *Carlisle Cashway, Inc. v. Johnson (In re Johnson)*, 691 F.2d 249, 254 (6th Cir. 1982) ("Federal, not state law controls our determination because it is the intent of Congress in using the word 'defalcation' that we seek to discover."); *see also In re Hartman*, 254 B.R. 669, 672 (Bankr. E.D. Pa. 2000). "The traditional definition of fiduciary, involving a person who stands in a

11

special relationship of trust, confidence, and good faith, is 'far too broad for the purposes of bankruptcy law.'" *In re Librandi*, 183 B.R. 379, 382 (M.D. Pa. 1995). Instead, the term is limited to instances involving express or technical trusts which were imposed before and without reference to the wrongdoing that caused the debt. *In re Hartman*, 254 B.R. at 672. To establish an express trust, three elements must be met: (1) a declaration of trust; (2) a clearly defined trust res; and (3) an intent to create a trust relationship. *In re Massaro*, 235 B.R. 757, 763 (Bankr. D.N.J. 1999) (citing *In re Librandi*, 183 B.R. 379, 382 (M.D. Pa. 1995)).

"In determining whether a technical trust relationship exists, courts have consistently considered state law relevant in determining whether a debtor was acting as a fiduciary under the Bankruptcy Code." *In re Christian*, 172 B.R. 490, 496 (Bankr. D. Mass. 1994). To create a fiduciary relationship, a state statute must define the trust res, spell out the trustee's fiduciary duties, and impose a trust prior to and without reference to the wrong which created the debt. *Id*. "Statutorily created 'trusts' create fiduciary duties that are dependent upon the relationship between the parties, but are not created by agreement of the parties nor created ex post facto as a remedial measure to right a wrong." *Id*. To show a fiduciary capacity arising from a statutorily created trust for the purposes of § 523(a)(4), a creditor must point to an express legislative design to create a trust relationship. *Id*.

This analytical framework easily applies to the obligations created by the New Jersey Rent Security Deposit Act, N.J.S.A. § 46:8–19. The New Jersey Rent Security Deposit Act provides:

> Whenever money or other form of security shall be deposited or advanced on a contract, lease or license agreement for the use or rental of real property as security for performance of the contract, lease or agreement or to be applied to payments upon such contract, lease or agreement when due, such money or other form of security, until repaid or so applied including the tenant's portion of the interest or earnings accumulated thereon as hereinafter provided,

12

> shall continue to be the property of the person making such deposit or advance ***and shall be held in trust by the person with whom such deposit or advance shall be made for the use in accordance with the terms of the contract, lease or agreement and shall not be mingled with the personal property or become an asset of the person receiving the same.***
>
> The person receiving money so deposited or advanced shall:
> a. (1) Invest that money in shares of an insured money market fund established by an investment company based in this State. . . or (2) ***deposit that money in a State or federally chartered bank, savings bank or savings and loan association in this State insured by an agency of the federal government in an account bearing a variable rate of interest. . .***

N.J.S.A. § 46:8–19 (emphasis added).

    The plain language of the statute, "shall be held in trust" and "shall not be mingled" strongly evidences the existence of a trust. N.J.S.A. § 46:8–19. The trust res created by the statute is the "money or other form of security deposited. . . for the use or rental of real property as security for performance of the contract." N.J.S.A. § 46:8–19. The statute makes clear that the funds should be held in trust and not mingled with the personal property or become an asset of the person receiving same. N.J.S.A. § 46:8–19. Accordingly, the New Jersey Rent Security Deposit Act establishes a trust.

    The decision *In re Kaczynski*, 188 B.R. 770 (Bankr. D.N.J. 1995) also supports the court's determination in this matter. In *Kaczynski*, the State of New Jersey filed a complaint against debtors seeking nondischargeability with respect to proceeds of lottery tickets which the debtors sold, but failed to turn over to the Lottery Commission. *In re Kaczynski*, 188 B.R. at 772–773. Pursuant to its analysis of certain provisions in the New Jersey Administrative Code, the Bankruptcy Court found that the debtors were acting in a fiduciary capacity. *Id.* at 776–777. One of the applicable provisions, New Jersey Administrative Code § 17:20-6.3(a)–(d), deposit of lottery moneys, states the following in pertinent part:

13

> (b) Moneys received by an agent from the sale of lottery tickets are the property of the lottery and are held by the agent in trust for the lottery. The agent shall immediately segregate all moneys received from the sale of lottery tickets, and shall hold such moneys in trust for the lottery in a bank account specifically designated as a New Jersey Lottery Account.
> (c) Agent shall file with the Director or his or her designee reports of their receipts and transactions concerning the sale and redemption of lottery tickets in a form as prescribed by the respective game instructions.
> (d) The agent shall be absolutely liable for payment of such moneys to the lottery notwithstanding the degree of care exercised with respect to such moneys by the agent.

N.J. ADMIN. CODE § 17:20–6.3(a)–(d) (1988).

The Bankruptcy Court determined that New Jersey Administrative Code § 17:20–6.3(a)–(d) imposed fiduciary obligations because it creates an express trust. *Id.* at 777. "All the elements of an express trust are met: (1) the Commissioner's Rules expressly and clearly declare a trust relationship upon lottery ticket agents; (2) the Rules clearly define the trust res as the tickets and/or the proceeds from ticket sales; and (3) the Rules charge the trustee with the affirmative duties of recording, maintaining, and applying trust funds." *Id*.

The court is persuaded by the reasoning set forth in *Kaczynski* and finds that the language of the New Jersey Rent Security Deposit Act similarly creates an express trust. The provisions of the Act create a trust relationship by defining a trust res and imposing affirmative duties on the landlord as trustee.

In the matter at hand, the Plaintiffs provided an $18,000 security deposit to SAJ as required by the Lease. The New Jersey Rent Security Deposit Act expressly states that whenever funds are received as security for a lease, they shall be held in trust, shall not be mingled, and shall be deposited in an account bearing a variable rate of interest. N.J.S.A. §

14

46:8–19.  Because the plain language of the New Jersey Rent Security Deposit Act creates a trust relationship, as set forth above, the Debtor is a fiduciary for purposes of § 523(a)(4).

The Debtor argues that no fiduciary relationship exists between the Debtor and the Plaintiffs.  The Debtor relies on *In re Ardolino*, 298 B.R. 541 (Bankr. W.D. Pa. 2003), which held that the debtor-landlord did not stand in a "fiduciary capacity" with the creditor-tenant regarding a debt for an unreturned portion of the creditor's security deposit for purposes of § 523(a)(4).  The Debtor's reliance on *Ardolino* is misplaced.

The Bankruptcy Court in *Ardolino* found that the terms of the lease agreement between the parties did not establish an "express" trust.  *In re Ardolino*, 298 B.R. at 547.  Additionally, the Bankruptcy Court rejected the argument that the applicable Pennsylvania statute operated to establish a technical trust regarding the security deposit.  *Id.*  The Bankruptcy Court noted that the applicable statutory provision under Pennsylvania law, specifically Pa. Cons. Stat. § 250.511b,[3] only required that a security deposit be placed in a separate escrow account "after the second anniversary of the deposit of escrow funds," meaning only at the beginning of the

---

[3] (a) Except as otherwise provided in this section, all funds over one hundred dollars ($100) deposited with a lessor to secure the execution of a rental agreement on residential property in accordance with section 511.1 and pursuant to any lease newly executed or reexecuted after the effective date of this act shall be deposited in an escrow account of an institution regulated by the Federal Reserve Board, the Federal Home Loan Bank Board, Comptroller of the Currency, or the Pennsylvania Department of Banking. When any funds are deposited in any escrow account, interest-bearing or noninterest-bearing, the lessor shall thereupon notify in writing each of the tenants making any such deposit, giving the name and address of the banking institution in which such deposits are held, and the amount of such deposits.

(b) Whenever any money is required to be deposited in an interest-bearing escrow savings account, in accordance with section 511.1, then the lessor shall be entitled to receive as administrative expenses, a sum equivalent to one per cent per annum upon the security money so deposited, which shall be in lieu of all other administrative and custodial expenses. The balance of the interest paid shall be the money of the tenant making the deposit and will be paid to said tenant annually upon the anniversary date of the commencement of his lease.

(c) The provisions of this section shall apply only after the second anniversary of the deposit of escrow funds.

Pa. Cons. Stat. § 250.511b

third year of a lease. *Id.* Since the lease at issue in *Ardolino* was less than two years in duration, the Bankruptcy Court determined that no technical trust was created because the funds were not required to be separated. *Id.*

Because the Bankruptcy Court found that no express or technical trust was created, no fiduciary relationship existed. *Id.* However, it is notable that the Bankruptcy Court ultimately held that although the debtor did not stand in a "fiduciary capacity" to the plaintiff, the debtor's failure to return the unearned portion of the security deposit and the debtor's misappropriation thereof constituted embezzlement within the meaning of § 523(a)(4). *Id.* at 548−549.

### 2. *Scope of "Defalcation"*

Having found that the Debtor is a fiduciary under the New Jersey Rent Security Deposit Act, the court must determine whether the Debtor committed a "defalcation" within the scope of § 523(a)(4) of the Code. Unfortunately, the Bankruptcy Code does not define the term "defalcation," and there exists no comment or legislative history to aid in the interpretation of the term. *In re Tamis*, 398 B.R. 124, 130 (Bankr. D.N.J. 2008); *see also* In *re Kaczynski*, 188 B.R. 770, 777 (Bankr. D.N.J. 1995). As a result, there has been no judicial consensus as to the meaning of "defalcation" in the context of § 523(a)(4). *In re Tamis*, 398 B.R. at 130; *In re Tyson*, 450 B.R. at 524. However, the United States Supreme Court recently clarified the interpretation of "defalcation" in *Bullock v. BankChampaign N.A.*, ___ U.S. ___ , 133 S. Ct. 1754 (May 13, 2013).

In *Bullock*, the debtor was a nonprofessional trustee of a trust established by his father for the debtor's benefit and that of his siblings. *Bullock*, ___ U.S. ___ , 133 S. Ct. at 1757. The trust's sole asset was the father's life insurance policy. *Id.* While acting as trustee, the debtor

16

borrowed funds from the trust on three separate occasions. *Id.* The debtor subsequently repaid the borrowed funds with 6% interest. *Id.*

The debtor's brother sued the debtor in an Illinois state court for breach of fiduciary duty and ultimately obtained a judgment against him. *Id.* Although the state court did not find in favor of the debtor, the court noted that the debtor "[did] not appear to have had a malicious motive in borrowing funds from the trust." *Id.* The state court imposed constructive trusts on certain of the debtor's interests in a mill and in the original trust in order to secure the debtor's payment of its judgment, with BankChampaign serving as trustee for all of the trusts. *Bullock*, ___ U.S. ___, 133 S. Ct. at 1757. The debtor subsequently filed for bankruptcy. *Id.*

During the debtor's bankruptcy, BankChampaign, on behalf of the trusts, opposed discharge of the debts owed to the trust. *Id.* The Bankruptcy Court granted BankChampaign summary judgment, holding that the debts were nondischargeable pursuant to § 523(a)(4) of the Bankruptcy Code. *Id.* at 1757–1758. The District Court and the Eleventh Circuit affirmed. *Id.* at 1758. Certiorari was subsequently granted. *Id.*

The Supreme Court framed the issue as whether the "defalcation" applies "in the absence of any specific finding of ill intent or evidence of ultimate loss of trust principal." *Bullock*, ___ U.S. ___, 133 S. Ct. at 1758. The Supreme Court held that the term "defalcation" includes a culpable state of mind requirement involving knowledge of, or gross recklessness in respect to, the improper nature of fiduciary behavior. *See id.* at 1759–1760.

The Court explained that where the conduct does not involve bad faith, moral turpitude, or other immoral conduct, "defalcation" requires an intentional wrong. *Id.* at 1759. Looking to the Model Penal Code, the Court stated that intentional wrong "includes not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent." *Id.* Furthermore, "where actual knowledge of wrongdoing is lacking,

17

we consider conduct as equivalent if the fiduciary 'consciously disregards,' (or is willfully blind to), 'a substantial and unjustifiable risk' that his conduct will turn out to violate a fiduciary duty." *Id.*

Applying *Bullock* to the matter at hand, it is apparent that the Debtor's failure to observe the requirements of the New Jersey Rent Security Deposit Act and failure to return the security deposit to the Plaintiffs were knowing and intentional acts that constitute defalcation. As evidenced by his dealings with the Plaintiffs and his ownership interests in the five corporate entities listed in his bankruptcy schedules, the Debtor is a sophisticated businessman. His failure to observe the requirements of the New Jersey Rent Security Deposit Act can only be viewed as intentional, or at best, in reckless disregard of his obligations to the Plaintiffs.

The express language of the Lease that the Debtor tendered to the Plaintiffs sets forth the specific responsibilities of a landlord under to the New Jersey Rent Security Deposit Act. The Debtor must be presumed to know the provisions of the Lease that he required the Plaintiffs to sign, and the record does not contain an affidavit or certification disavowing knowledge of the Lease terms. In direct violation of the Lease and the statute, the Debtor deposited the Plaintiffs' $18,000 security deposit into the SAJ checking account and shortly thereafter issued two checks totaling $18,000 from the SAJ checking account payable to D'Urso Holdings, LLC, an entity wholly owned by the Debtor. The Debtor proffers no explanation regarding the transfer of these funds. In fact, there is no evidence that the Debtor ever placed the Plaintiffs' security deposit in an account that met the requirements of the New Jersey statute. Further, the Parisi certification establishes that the Debtor never returned the security deposit to the Plaintiffs.

The Bank Records provided by Plaintiff demonstrate that in April 2009 the Debtor deposited the Plaintiffs' security deposit into the SAJ checking account, thereby mingling the funds with other SAJ funds. By failing to place the security deposit in a separate interest

bearing account, the Debtor violated the New Jersey Rent Security Deposit Act. Specifically, the statute states that the deposit ". . . shall be held in trust by the person with whom such deposit or advance shall be made for the use in accordance with the terms of the contract, lease or agreement and shall not be mingled with the personal property or become an asset of the person receiving the same." N.J.S.A. § 46:8–19. The Debtor's failure to meet the fiduciary obligations imposed by the New Jersey statute was compounded when the Debtor issued two checks totaling $18,000 from the SAJ checking account and deposited them into D'Urso Holdings, LLC. The court does not find it plausible to infer that it is coincidental that the same month that the Debtor deposited Plaintiff's $18,000 security deposit in the SAJ account, he caused the same amount of funds to be withdrawn from SAJ and placed in the checking account of his wholly owned subsidiary. Rather, the Debtor's conduct illustrates both his dominion over the affairs of SAJ, and his intent to use the $18,000 security deposit for his own purposes.

Because the record evidences that the Debtor is a sophisticated businessman who dominated the affairs of SAJ, and the Debtor has not provided any explanation for his conduct, the court concludes that the Debtor knew his conduct to be improper, thereby satisfying the intent element for defalcation. Alternatively, the Debtor's conduct demonstrates that he consciously disregarded, or was willfully blind to, "a substantial and unjustifiable risk" that his conduct would turn out to violate a fiduciary duty. Accordingly, because the court finds that the Debtor committed a defalcation while acting in a fiduciary capacity, under Code § 524(a)(4), the debt to the Plaintiffs is nondischargeable.

## **CONCLUSION**

This court finds that the corporate veil may be pierced and that the Debtor is liable to the Plaintiffs for the return of their $18,000 security deposit. Further, while subject to fiduciary

obligations, the Debtor committed a defalcation pursuant to Code § 523(a)(4). Thus, the debt to the Plaintiffs is nondischargeable. Accordingly, the Debtor's Motion for Summary Judgment is denied and the Plaintiffs' Motion for Summary Judgment is granted.


Dated: June 27, 2013 　　　　　　　　　　　_____/S/_____
　　　　　　　　　　　　　　　　　　　　　　NOVALYN L. WINFIELD
　　　　　　　　　　　　　　　　　　　　　　United States Bankruptcy Judge